## ABNER TOOTHAKER *vs.* HEZEKIAH WINSLOW.

*Charter—construction of. Action on the case—when maintainable.*

The Richardson Lake Dam Company, under its charter, c. 104 of the Private and Special Laws of 1853, has the right to maintain its dams and to keep its gates closed, although the natural flow of the water from the lake may thereby be impeded and diminished.

The remedy for an illegal hoisting of these gates is not confined to the corporation, but may be sought in an action brought by any individual injured thereby, in his own name and for his own benefit, declaring upon the particular and special injury done to him.

· ON DEMURRER.

Action on the case, alleging that the plaintiff had a large number of logs in Mooselukmaguntic and Richardson lakes and waters connected therewith, which were to be driven across those lakes and into the Androscoggin river; that he had arranged with the Richardson Lake Dam Company to hold back sufficient water to enable him to conveniently float his drive until it should reach the dams of that company at the outlets of these lakes; and that the defendant wrongfully hoisted the gates of said dams, whereby the water was let out and lowered, so that the plaintiff's logs were stranded and dispersed, and he was prevented from getting them into the river that season, and thereby many of them were lost and the rest greatly depreciated in value. The defendant demurred to the declaration, not as mere matter of pleading, but to determine whether or not the plaintiff could maintain his action if all the facts stated were assumed to be set out with technical accuracy. By agreement the case was presented to this court without any ruling upon the demurrer at *nisi prius*, so far as the report shows. The opinion of the court more fully states all material facts.

*J. H. Drummond,* in support of demurrer.

We desire to present no merely technical objection, but seek a result decisive of this suit and of the rights of the parties, raising two questions. 1st, Can the plaintiff maintain suit in his own name, or should it be in that of the Richardson Lake Dam Co.? And, 2d, Has that corporation the right to diminish the natural flow of the water? The first question arises under both counts, and the second only under the first count, the second being so framed as to avoid it. The company was chartered by act approved March 22, 1853, for purposes therein specifically stated. They can impose a toll of four cents on every log passing their dam at the outlet of Mooselukmaguntic Lake, and three cents more for each one passing the dam at the outlet of Richardson Lake, by section 4 of said Act. Reference is made to this section to identi-

fy the lakes, as on the State map the upper lake is called Moose-tocmnaguntic, or Great Lake; the next one Richardson, or Mole-chunkemunk Lake, and the lower one Welskenebacook, or Richardson Lake. The first one is that designated in the charter as Mooselukmaguntic, and the last is there (and generally) called Richardson Lake. The dam referred to in the plaintiff's declaration is at the outlet of the last (or lower) lake, and is in the plantation next east of the town of Upton, in Oxford county.

The Androscoggin river is a natural highway of which the court takes judicial notice. Richardson lake lies above Umbagog, and the dam in controversy is in the river between these two lakes. As the toll is payable so soon as a log passes the dam it is evident they were built to benefit the river above and not below them; the charter never contemplated holding the water back to facilitate driving the logs below the dam. The plaintiff can only recover for logs detained above the dam, and which he could not float across the lake, if he prevail in this suit.

The Richardson Lake Dam Company, as the declaration alleges, built the dam and own it; if there be discretion vested anywhere as to holding back and letting out the water, it is in the company, and in nobody else.

The presumption is that the water of the river ought to flow in its natural channel, in its usual quantities, without let or hindrance. The plaintiff cannot maintain this action. 1. It is not alleged that he owns or has any interest in the dam; only that he had contracted with the company to run his logs through it, etc. Upon this allegation plaintiff claims to have water retained for his logs, without regard to the rights of other log-owners above and below the dam; and that he, therefore, has a right of action against any one for interfering with the dam and using the water. The charter for improving a natural highway and imposing tolls upon those using it confers no exclusive right to its use. Nor can any preference be shown as to its use; no contract with plaintiff can give such preference. *N. E. Express Co.* v. *M. C. R. R.*, 57 Maine, 188. In his second count plaintiff says the company authorized

Toothaker *v.* Winslow.

and directed him to keep the gates closed and the water back till his drive reached the dam, etc. If he were the company's agent for this purpose, he cannot maintain suit in his own name; if he were not, they could give him no such authority, as a privilege peculiar to him. *Veazie* v. *Dwinel*, 50 Maine, 479; *Gerrish* v. *Brown*, 51 Maine, 256; *Davis* v. *Winslow*, 51 Maine, 264; *Lancy* v. *Clifford*, 54 Maine, 487.

The water is held back by the company for such of the public as choose to use it, paying tolls. Can any individual who wishes to avail himself of this reserved water maintain suit against any one who tortiously draws it off, leaving the river no worse off than if the dam had never been put there?

There was no legal right in plaintiff to have the water reserved; the corporation could have let it off at its discretion, and the defendant only did what the company might have done. All plaintiff had a legal right to was so much water as naturally flowed in the river, and that was left him. One can have no legal right in what lies in the discretion of another; hence, exceptions do not lie to the ruling of a judge in discretionary matters.

II. The Dam Co. were bound to allow the usual flow of water to pass. By the first count it is claimed they had a right to use their dam as a reservoir dam; and by the second that the usual quantity of water was flowing over the dam. It is an important question to the company, but still more so to log-owners below the dam, whether or no they are rightfully subject to have their logs left in the dry bed of the river at one time, and then swept out on the banks at another, by the sudden letting out of the water by this corporation. The grant of a right to use such an obstruction of a natural highway should be construed strictly. It must be so exercised as to preserve the rights of others. 50 Maine, 479; *Parks* v. *Morse*, 52 Maine, 260. The legislature did not intend that the rights of all owners below the dam from Lake Umbagog to Merrymeeting Bay should depend upon the discretion of this company. Their charter says nothing about reservoir dams, but speaks of dams with sluices, etc. *Clark* v. *Rockland Water Power*

Toothaker *v.* Winslow.

*Co.,* 52 Maine, 68, 78 ; *Knox* v. *Chaloner,* 42 Maine, 150 ; *Pills-bury* v. *Moore,* 44 Maine, 154 ; *Davis* v. *Getchell,* 50 Maine, 602 ; *Davis* v. *Winslow,* 51 Maine, 264.

*H. L. Whitcomb,* for plaintiff, *contra.*

There was a large quantity of lumber around the lakes from which the Androscoggin takes its rise and the streams flowing into these lakes, but previous to 1853 it was valueless because of the difficulty of marketing it. The outlets from one lake to another were of such character that it was impossible to float logs into the river profitably. Hence the necessity for the dam about which this controversy arises. The gates in these outlet dams are closed in the fall and by the melting snows and freshets of spring the water is raised from twelve to fifteen feet, and that quantity is preserved while the logs are being taken across the lakes in booms, the natural quantity of water at the same time passing through the sluices so that no one below can be injured in the least. The necessary result of erecting the dams was to flow large areas of circumjacent land; hence the charter (Acts of 1853, c. 104) was procured. These dams have opened to the market a vast supply of lumber, adding largely to the wealth of those regions and to the property of the defendant in that vicinity. To attain these ends the legislature had a right to grant this charter.

The second count alleges that the usual quantity of water was passing into the river by the sluices; that Winslow "wilfully" hoisted three of the gates; these facts the demurrer admits, while nothing in the case shows that he, or anybody else was at all injured by such obstruction as the dam occasioned. After the company had expended $100,000, and plaintiff had cut, hauled, boomed, and driven 9,650,000 feet of lumber, costing, say $50,000 more, one man, at his own caprice, claims the right to hoist the gates, drain off the water, and thus frustrate and render abortive the whole object and purpose of the corporation, and destroy, or greatly depreciate in value the logs of the plaintiff, while it does not appear that this man ever had a log in the river, or was ever inter-

ested one cent in the gates being kept open or closed! If he can hoist these gates in 1870 he can at any and all other times of his own good will and pleasure do the same, and thwart the whole object for which the legislature granted the charter. It was obvious that the exercise of the rights conferred would to some extent impede navigation of the stream by logs or rafts, and the legislature could properly permit this. *Parker* v. *Cutler Mill Dam Co.*, 20 Maine, 353.

But can the plaintiff maintain this action in his own name? We think so, because he is the party injured by the tortious acts of defendant.. The plaintiff was constructively in possession of the dam for his purposes, by authority of and contract with the company; and it was only because he relied on this arrangement for retaining the water, that he incurred the great expense we have mentioned. The loss to the Dam Company might be trifling, as the logs would mostly pass through and pay toll another season; but to plaintiff it would be very great. The court cannot "take judicial notice" that the river was navigable at this point within the definition given in *Brown* v. *Chadbourne*, 31 Maine, 9; *Treat* v. *Lord*, 42 Maine, 552, and *Brown* v. *Black*, 43 Maine, 443.

Why should a charter be granted and tolls be imposed to maintain dams "at the outlets" of these lakes that were not to raise the water by acting as "reservoir dams?"

The plaintiff had same right to have his logs pass unmolested that he would to ride uninterrupted along a turnpike, paying toll.

BARROWS, J. The facts alleged in the declaration and admitted by the demurrer are substantially as follows: The Richardson Lake Dam Company, incorporated by special act of the legislature in 1853, for the purpose of making such improvements on the Androscoggin river and its tributaries as would facilitate the floating of logs, timber, masts, and spars to a market, and authorized to remove obstructions, build dams and wing-dams, gates, piers, booms, etc., with the various rights and privileges enjoyed by other similar corporations under the laws of this State, and empowered to take

such lands as might be necessary for the sites of their dams, booms, and sluices, and to demand a certain toll upon every log passing their dam at the outlet of Mooselukmaguntic Lake, and another certain toll upon every log passing their dam at the outlet of the Richardson Lake, had erected costly dams, sluices, gates, etc., at the outlet of each of said lakes, and expended large sums in removing the obstructions in those waters, and greatly facilitated the running of logs and timber through those lakes and their outlets, and at last into the Androscoggin river, by preserving and holding back the water for that purpose; and in the season of 1869–70 the plaintiff had cut and landed on the tributary waters above these dams a large quantity (exceeding nine millions of feet) of logs and timber, and had contracted with the corporation that he should run the same through their dams and sluices upon payment of the required toll, and in the spring of 1870 had driven the logs through the Mooselukmaguntic, and into the Richardson Lake; and the gates of the dam at the outlet of Richardson Lake were closed for the purpose of saving the water to facilitate the driving of the logs. Defendant knew these facts and knew the necessity of keeping the gates closed till plaintiff's logs arrived there, but on the 1st day of June, 1870, wilfully hoisted three of the gates before the plaintiff's logs arrived, and kept them open a long time though requested by plaintiff to desist, and so reduced the water in the lake as greatly to hinder and delay the plaintiff in getting his logs across the lake, and prevented him from getting them out that season, by which means they were greatly depreciated in value, a portion of them lost, and the plaintiff was put to great expense.

A second count in the writ sets forth the same facts, with the additional allegation that the plaintiff had been authorized and directed by the corporation to keep the gates closed until he should get there with his drive, and be ready to have them pass through the sluices, and that defendant wilfully hoisted the gates and kept them up, although before he did this as much water was running from the Richardson Lake to the lake below as would have run had there been no dam there.

Waiving all objections that may be readily cured by amendment, the defendant seeks now a decision of two questions only: 1. Whether the plaintiff can maintain any action against the defendant upon the foregoing facts? 2. Whether the Richardson Lake Dam Company has the right under its charter to stop all the water flowing there, or is bound at all times to let the usual flow of water pass after its dams are once filled?

The defendant contends that for any wrong he has done by intermeddling with the property of the Richardson Lake Dam Company, the remedy is to be sought by suit in the name of that corporation; that if the charter of that company confers upon any one the right to diminish the natural flow of the water at one time, and increase its volume at another, it is only a discretionary power vested in the company alone; that no individual citizen having a contract with the company to run his logs through their dams, has a right to have the water retained for his logs regardless of the convenience of those who have occasion to use the river as a highway or the water for other purposes; that any attempt on the part of the company to confer special, or greater, or exclusive rights and privileges upon any individual, would be in violation of the rights of other citizens, and therefore void; that if plaintiff asserts a right as agent of the company under the authority given him to keep the gates closed, any suit for the violation of that right must necessarily be in the name of the company; that as one of the public, the plaintiff had no legal right to have the reserved water retained to float his logs, his only legal right being to the water as it was wont to run in a state of nature; that at best his rights to the reserved water were subject to the discretion of the company, and so the defendant has not been guilty of depriving the plaintiff of any legal right, and consequently no action can be maintained by the plaintiff against him. And whether these positions are found correct or not, he contends that at all events no action can be maintained upon the first count for want of an averment that the natural and usual flow of water was passing the dam at the time the defendant did the acts complained of; that the Dam Com-

pany, after completing and filling their dams are bound at all times to allow the usual flow of the stream to pass their dam, and if they do not, the dam is so far a nuisance which defendant had a right to abate.

It is quite apparent that a part of the questions which the defendant proposes to raise do not properly come before us on a demurrer to the declaration, but will arise, if at all, when his justification comes to be heard.

If the chartered rights of the Dam Co. are so abused as to make the dam a nuisance, still only those whose rights and privileges were injured or abridged thereby would have a right to abate it; and in this stage of the case it does not appear that the defendant is in a position to set up such a defense.

A mere intermeddler, who has no occasion to intervene for the protection of substantial rights of his own, and cannot justify as the servant of one who had such rights requiring protection, could not be heard to assert a justification of that sort.

For aught that appears here the defendant was a mere volunteer to redress grievances which, whether real or imaginary, did not in any manner affect him, or any one for whom he was authorized to act. If it shall appear at the trial of the cause that the defendant may rightfully enter upon such an inquiry, it will be in season then to determine in the light of the testimony offered by both parties whether the defendant's acts can be justified as the abatement of a nuisance specially prejudicial to himself or those for whom he acted.

We therefore pass this part of the case at the present time with the single remark, that while it is doubtless true that in the exercise of any and all chartered privileges and powers which are in derogation or restriction of common rights, all due and reasonable care must be used to avoid any unnecessary or unreasonable abridgment of the public right, or injury to those who have occasion to exercise it, it must not be expected that such a construction of the act will be adopted as will make the legislative grant nugatory, or deprive the privilege conferred thereby of its substantial value.

Reasonable mutual regard for the convenience and interest of all other parties liable to be unfavorably affected, and due care to avoid needless injury or hindrance to them, must be the rule of action on all hands.

Whether either party to this suit has been guilty of a breach of this rule, and if so, which, are not questions that can be intelligently decided upon a demurrer to this declaration or to either of the counts in it.

All that can be said at present is that the legislature in the legitimate exercise of their power of eminent domain have granted powers and privileges to the Richardson Lake Dam Company which must necessarily, to some extent, affect the use of the water below, and the common rights of all citizens to the use of the stream as a public highway; yet the powers thus granted are to be exercised in a reasonably discreet manner, for the accomplishment of the purpose for which the grant was made, with as slight disturbance or abridgment of the public rights as may be.

The principal matter for us to settle now is whether, upon the facts alleged in these counts, remitting the consideration of all questions properly arising upon the defense foreshadowed to the time when the defense is shown, the plaintiff can maintain his action against the defendant.

In the absence of any matter tending to establish a defense we see no reason to doubt his right to do so upon either of the counts, assuming such amendments made as the defendant concedes may be made according to the understanding of the parties, if the points which the defendant makes against the maintenance of any suit by plaintiff are not tenable.

There is a want of any direct averment that the defendant did the acts complained of "without right" as well as "wilfully," which the plaintiff will do well to amend; but the defendant concedes in argument that as this case is presented, the drawing off of the water is to be considered as tortiously done.

We do not think that any legal inference can be drawn from the facts as here set forth that any contract of the Dam Company with

the plaintiff that he should be permitted to run his logs through the dams and have the water retained to facilitate his so doing, or any authority that the Dam Company might have given him to keep the gates shut to further that design, was void upon any such ground as was held to vacate the exclusive privileges attempted to be conferred on the Eastern Express Company by the Railroad Company in the case of *The New England Express Co.* v. *The Maine Central R. R. Co.*, 57 Maine, 188.

We are dealing now only with the facts as alleged by the plaintiff, and cannot take cognizance here of possibilities which might change their aspect. Neither do we think it can be maintained that the plaintiff had no right to anything beyond the natural flow of the water as it was before the improvements made by the Dam Company.

Unless there were an illegal abuse of the powers conferred by the charter, of which assuredly we have now no evidence, so far as any matter or thing that is made to appear in this case goes, he had a right to that improved condition of the water to effect which the Dam Company was created—a right according to the allegations in this writ not dependent at all upon the discretion of the Dam Company—a right which, independent of any contract or agency, would rest in the plaintiff until he was deprived of it in the exercise of a sound, legal discretion of parties having the right to do it under all the circumstances and necessities of the case. It is not a right resting in the mere discretion of anybody, but one for any tortious interference with which the plaintiff may maintain suit to recover the damages he has thereby sustained.

And it illustrates well the indirect injury for the infliction of which the special action on the case was deemed long ago the appropriate remedy.

A wrong-doer may expose himself to as many suits as there are parties whose rights and interests are injuriously affected by his wrongful acts.

The Dam Company might have their action for any wrongful intermeddling with their franchises and property; but this would

not preclude the plaintiff, or any other party whose pecuniary interests were directly and injuriously affected, from maintaining suit for the special damage he might also sustain. Nor can it be said, admitting the truth of the averments in this writ, that the plaintiff sustained no special damage which was the direct and natural consequence of the defendant's acts.

He in common with any other party similarly situated, had a legal right to the use of the water in the improved condition in which it had been placed by the operations of the Dam Company to float his drive of logs to the market, for aught that appears here.

For any interference with that right which the defendant cannot justify, he must respond in damages.

The man who is traveling upon a turnpike has as much right to maintain an action against him whose tortious digging of a ditch or placing of an obstruction in the path occasions him an injury, as if he were traveling upon a common highway.

*Demurrer overruled.*

APPLETON, C. J.; WALTON, DICKERSON, and DANFORTH, JJ., concurred.